E-FILED
Friday, 08 May, 2026  03:36:14 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| PIERRE MONTANEZ, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-1177 |
| | ) | |
| PAMELA E. HART, *Administrator of the* | ) | |
| *The Estate of Dr. Andrew H. Tilden et al.,* | ) | |
| Defendants. | ) | |

OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is a Motion for Summary Judgment (Doc. 97) filed by Defendants

Cheryl B. Hansen, a former Nurse Practitioner at Pontiac Correctional Center ("Pontiac"),

and Pamela E. Hart, Administrator for the Estate of Dr. Andrew H. Tilden. Plaintiff Pierre

Montanez, an inmate at Dixon Correctional Center, has filed a response (Doc. 101), and

Defendants have filed their reply (Doc. 111).

I.      Background

Plaintiff's Amended Complaint (Doc. 63) alleged a lack of medical treatment for

right shoulder and right knee pain, numbness in his right hand, and adverse COVID-19

symptoms. After screening, the Court determined Plaintiff's amended pleading stated

First Amendment retaliation and Eighth Amendment deliberate indifference to serious

medical need claims against Defendants Hart and Hansen. (Doc. 62)

In so concluding, the Court directed Plaintiff to file a separate motion specifically

outlining the claim alleged in his amended pleading that Defendants Hansen and Hart

"destroyed, altered, modified, changed, or otherwise falsified his medical records, which included X-ray results, to show that medical professionals did not see him on August 6, 2021, and that his right knee was normal, among other issues." (*Id.* at 4.) Plaintiff did not comply with the Court's instructions.

## II.    Summary Judgment

### A. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of providing documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

A party opposing a supported motion for summary judgment must cite parts of the record or show the materials cited do not show the absence of a genuine dispute. *Melton v. Tippeconoe County*, 838 F.3d 814, 818 (7th Cir. 2016). The court construes all facts in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in her favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A scintilla of evidence supporting the nonmovant's position is insufficient to defeat a motion for summary judgment; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

### B. Undisputed Material Facts

Plaintiff was incarcerated at Pontiac from January 1, 2021, to November 21, 2022. (Doc. 97-1 at 14:3-9; Doc. 7 at 1.) Defendant Hansen was employed by Wexford Health Sources, Incorporated ("Wexford") as a nurse practitioner at Pontiac from May 31, 2016, to April 26, 2023, when she voluntarily ended her employment. (Doc. 97-7 at 1:4.) Wexford employed Dr. Tilden as Medical Director at Pontiac from November 23, 2010, until February 23, 2018, and from October 31, 2018, until February 19, 2023. (Doc. 97-2 at 2:4, 9.) Dr. Tilden was on leave of absence from December 2, 2017, to February 23, 2018, and from November 11, 2022, until his death on February 19, 2023. (*Id.*)

To obtain healthcare at Pontiac, an inmate submits a sick call request slip. (Doc. 97-1 at 20:5–14; 21:7-14.) Plaintiff acknowledged either being escorted by a corrections officer or possessing a sick call pass whenever traveling to Pontiac's Healthcare Unit ("HCU"). (*Id.* at 15:16-16:1, 16:10-17:8, 18:7-9, 19:17-20.) After an inmate arrives at the HCU, he is placed in a holding room. (*Id.* at 36:5–13.) When appropriate, the inmate is taken from the secure area to another room for treatment by medical professionals. (*Id.* at 36:14–20.)

On January 18, 2021, Plaintiff was examined by a registered nurse ("RN") for intermittent pain in his left knee, which occurred when straightening his leg after being

bent for a long time. (Doc. 97-3 at 101.) The RN prescribed acetaminophen and ibuprofen three times daily for three days as needed and referred Plaintiff to the medical director. (*Id*.)

On January 21, 2021, Plaintiff saw Dr. Tilden for a follow-up appointment for left knee pain Plaintiff reported had worsened over the last two months. (*Id*. at 102.) Dr. Tilden observed Plaintiff had full range of motion in his left knee and no painful tenderness. Dr. Tilden ordered X-rays of Plaintiff's left knee to rule out osteoarthritis and provided pain relief cream to be applied two times a day for three months. (*Id*.) On January 22, 2021, a Diagnostic Radiology Specialist read the X-rays taken of Plaintiff's left knee and found the bony alignment normal, no definite evidence of an acute bony fracture, and low-grade osteoarthritis of the knee joint. (*Id*. at 69.)

On March 2 and 30, 2021, Plaintiff received his first and second dosages, respectively, of the Moderna COVID-19 vaccine. (*Id*., Doc. 97-4 at 67.) On April 23, 2021, Plaintiff saw Dr. Tilden, reporting left knee numbness. (*Id*., Doc. 97-3 at 107.) Dr. Tilden observed Plaintiff had full range of motion in his left knee, assessed him as having osteoarthritis as seen on X-rays, and provided Plaintiff with a pain relief cream to be taken twice daily for three months. (*Id*. at 29, 107.)

Plaintiff explained that he injured his right hand and right shoulder as a result of being handcuffed by correctional officers during a search of his cell on July 28, 2021. (Pl. Dep., Doc. 97-1 at 26:11-14, 26:22-27:5-12, 27:19–22.) Plaintiff characterized the injury to his right shoulder as pain, and the injury to his right hand as numbness and pain. (*Id*. at 27:13-18.) Plaintiff also noted his hand was red and swollen, with visible marks from

handcuffs being applied tightly. (*Id*. at 38:4-7.) Plaintiff had not injured his right hand before the shakedown on July 28, 2021. (*Id*. at 29:9-11.)

Nine days later, on August 6, 2021, Plaintiff complained of numbness in his right hand and right shoulder pain. (*Id*. at 29:14-24, 30:19-22, 37:8-15.) Plaintiff told a correctional officer his shoulder and his hand were "messed up." Shortly thereafter, the officer escorted Plaintiff to the HCU, where Plaintiff was placed in a locked waiting room with other inmates until HCU staff were ready to see them. (*Id*. at 30:14-22, 31:2-5, 32:1–5, 32:19–33:5.) Plaintiff noted the waiting room had bars, but he could see and talk to people who walked past. (*Id*. at 32:1-9, 33:16-21.)

Plaintiff explained that when a prisoner is sent to the HCU, they arrive at 8 a.m. and sometimes remain until 2 or 3 p.m. (*Id*. at 34:8-11.) Plaintiff estimated it was before 10 a.m. and he had been waiting "about [thirty] minutes, close to an hour" before he saw Dr. Tilden walking past the holding room. (*Id*. at 31:16-20, 38:9-16, 54:4-12.) Plaintiff stated he "wanted to be seen," so he got Dr. Tilden's attention by calling out to him and telling him, "[L]et's hurry this process up, basically." (*Id*. at 34:12-13.)

Dr. Tilden spoke briefly with Plaintiff. (*Id*. at 33:22-24, 34:16-22, 35:1-6, 43:20-24.) Plaintiff told Dr. Tilden about his problems. Although Plaintiff could not recall Dr. Tilden's exact response, he believed he said, "I've had a long day. I don't have time. I don't care what your issues are. I'm outta here." (*Id*. at 31:21-23, 34:16-18, 37:17-20.) Plaintiff states Dr. Tilden continued walking after Plaintiff relayed he was in pain, "and I'm not trying to be here all day." (*Id*. at 35:14-17.) Plaintiff did not know where Dr. Tilden

was going. (*Id*. at 34:23-24.) Plaintiff did not have any further conversations with Dr. Tilden on August 6, 2021. (*Id*. at 39:11-16.)

About an hour or two later, Plaintiff spoke with Defendant Hansen as she walked by the holding room. (*Id*. at 32:9-10; 39:17-24; 40:1-6, 10-24; 41:1-8; 54:4–15; 55:19–21.) Plaintiff told Hansen his arm was killing him and showed her his still swollen hand and directed her attention to the indentation marks on his wrist, where the handcuffs had been placed. (Pl. Dep. at 42:2-6, 54:23-55:8.) Although Plaintiff could not recall Hansen's exact response, he believed she said, "I don't have time for this." (*Id*. at 42:1-8, 20-24.) Plaintiff states Hansen did not examine his right arm or right shoulder on August 6, 2021. (*Id*. at 54:20-23.) Aside from Dr. Tilden and Hansen, Plaintiff did not speak to anyone else at the HCU regarding medical care on August 6, 2021. (*Id*. at 49:11-51:5.) After Plaintiff's interaction with Hansen, he walked back to his cell house, escorted by a correctional officer, at about 2 p.m. (*Id*. at 43:1-3, 9-10; 47:10-13; 48:16-22; 48:23–49:1.)

Defendant Hansen noted that if an inmate had been escorted by corrections staff for an unscheduled visit to the HCU but was not seen by a provider that day, it is likely no entry would have been made in the inmate's medical records. (Hansen Decl., Doc. 97-7 at 6:33.) An unrecorded visit would also likely occur under the circumstances Plaintiff described regarding his encounters with Dr. Tilden and Hansen on August 6, 2021. (*Id*. at 6:34.)

On the morning of September 23, 2021, Plaintiff saw an RN, complaining of posterior right knee pain. The RN documented Plaintiff reported the pain between three and eight on a ten-point scale, intermittent, varied in duration, and was not a condition

he had previously experienced. (Pl. Med. Rec., Doc. 97-3 at 7.) Plaintiff characterized the pain as "all over." (Pl. Dep. Doc. 97-1 at 67:5-9.) The RN also noted Plaintiff's denial of an acute injury and explanation that his injury occurred a couple of years earlier at the county jail, but it went away eventually. (Pl. Med. Rec., Doc. 97-3 at 7.) The RN also recorded her observations of no obvious signs of discomfort, swelling, deformity, or bruising. (*Id.*) The RN referred Plaintiff to the medical director. (*Id.*)

On November 9, 2021, Defendant Hansen saw Plaintiff at his cell front for complaints of right knee pain originating behind his knee and radiated upwards. Hansen documented that Plaintiff denied trauma, saying he had suffered right knee pain for three weeks. Hansen also documented that Plaintiff had full range of motion in his right knee, a normal gait, and did not exhibit acute distress. Hansen assessed Plaintiff as having right knee pain and ordered Motrin to be administered twice daily for three months, and follow-up in two weeks. (*Id.* at 10; Hansen Decl., Doc. 97-7 at 8:42-46.) Plaintiff added Hansen also referred him for an X-ray of his right knee. (Pl. Dep., Doc. 97-1 at 65:18-66:2.) Plaintiff agreed that ordering diagnostic testing was necessary to identify the origin of the pain he was experiencing in his right knee. (*Id.* at 72:5-18.)

On November 15, 2021, December 7, 2021, and January 12, 2022, Plaintiff was provided with 60 ibuprofen pills and, on January 7, 2022, with 10 ibuprofen pills, to be taken twice daily. (Pl. Med. Rec., Doc. 97-3 at 39, 40, 62-63.) On November 23, 2021, X-rays were taken of Plaintiff's right knee. (*Id.* at 11.) On November 24, 2021, a Diagnostic Radiology Specialist read the X-rays taken of Plaintiff's right knee and found that while the bony alignment was normal, mild tricompartmental osteoarthritis was seen without

a loose body or bony fracture, and without a sizable joint effusion (*i.e.*, extra fluid filling tissues around a joint, making it look puffy and swollen). (*Id.* at 74.)

Plaintiff tested positive for COVID-19 in January 2022. (Pl. Dep., Doc. 97-1 at 100:20-101:1; 145:16-22; 146:9-14.) On March 3, 2022, Defendant Hansen saw Plaintiff for complaints of memory loss, fatigue, and bilateral knee pain. (Pl. Med. Rec., Doc. 97-3 at 19, 120.) Hansen observed Plaintiff's gait was normal and had no knee deformities, but X-rays showed Plaintiff had mild osteoarthritis in both knees. (*Id.* at 20.) Hansen ordered a Complete Blood Count, a Comprehensive Metabolic Panel, hemoglobin A1C, and Thyroid-Stimulating Hormone testing, fish oil pills by mouth daily for six months, with follow-up in three weeks. (*Id.* at 19-20, 120-121.) Although Omega-3 fatty acids, known as fish oil, can mitigate COVID-19 symptoms, Hansen prescribed fish oil as a treatment for Plaintiff's knee pain. (Hansen Decl., Doc. 97-7 at 11:60.) Treatment for Long COVID-19 involves managing related symptoms, as no cure exists for Long COVID-19 and no medication is recommended as the standard of care. (*Id.* at 11:61.)

On March 9, 2022, a phlebotomist drew Plaintiff's blood for testing as Defendant Hansen ordered on March 3, 2022. (Pl. Med. Rec., Doc. 97-3 at 21, 122.) On March 10, 2022, Dr. Tilden reviewed the test results, which were within normal limits except for Eosinophil, which was 0.1 above the normal range of 0.0 to 6.01. (*Id.* at 97-3: 53, 55; 97-5 at 229-231.) Eosinophils are components of the immune system that fight infections, and a higher number may indicate many diagnoses, but a common one is allergies. (Hansen Decl., Doc. 97-7 at 11:64.) On March 15, 2022, Hansen renewed Plaintiff's Motrin

prescription to be taken by mouth twice daily for six months. (Pl. Med. Rec., Docs. 97-3 at 21; 97-5 at 237.)

On April 11, 2022, Defendant Hansen saw Plaintiff for a three-week follow-up for fatigue and memory loss, noting his pulse was 110 beats per minute, which is above the normal range of 60 to 100. (*Id.* at 21, 122.) Plaintiff reported drinking more than five cups of coffee daily, which contains caffeine that can elevate heart rate. (*Id.* at 12:69.) Hansen reviewed Plaintiff's earlier ordered laboratory results, all of which were within normal limits and advised him to decrease his caffeine consumption, increase his physical activity, and reduce weight through a low-fat diet for six months. Hansen then referred Plaintiff to the Medical Director for further evaluation. (Pl. Med. Rec., Doc. 97-3 at 21-22.)

On October 19, 2022, Dr. Tilden saw Plaintiff for complaints of memory loss and assessed Plaintiff as having low back pain, a history of seizures, pain in both knees, and complaints of memory loss. Dr. Tilden ordered a psychiatric evaluation. (*Id.* at 128.)

On November 9, 2022, Plaintiff saw an RN for throbbing pain in his right shoulder, which he stated had been there for years. (*Id.* at 07-5 at 103.) The RN observed he was unable to raise his arm above his head due to a limited range of motion, with pain increasing over the last few days, but no new trauma or falls. (*Id.* at 97-5 at 103.) Plaintiff declined both acetaminophen and ibuprofen, asserting he was allergic to ibuprofen. The RN referred Plaintiff to a nurse practitioner or physician. (Pl. Med. Rec., Doc. 97-5 at 103.)

On November 21, 2022, Plaintiff was transferred to Lawrence Correctional Center, and on December 6, 2022, Plaintiff was transferred to Pinckneyville Correctional Center ("Pinckneyville"). (Pl. Not. Change Addr., Docs. 7 at 1, Doc. 9 at 1.)

### C. Analysis

### 1. Deliberate Indifference

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To prevail on a claim of inadequate medical care, an inmate must show the prison official was deliberately indifferent to a serious medical need. *Id*. at 106. The deliberate indifference standard requires an inmate to satisfy a substantial threshold to support a cruel and unusual punishment claim under the Eighth Amendment. *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). "[A] claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

An objectively serious medical need is one a physician has diagnosed as mandating treatment or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). To satisfy the subjective component, a plaintiff must show "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"Claims of deliberate indifference to medical needs are examined differently depending on whether the defendants in question are medical professionals or [laypersons]." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). Treatment decisions made by medical professionals are presumptively valid. *Collignon v. Milwaukee County*,

163 F.3d 982, 989 (7th Cir. 1998). "A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances." *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). "When a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee*, 721 F.3d at 481 (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

The constitutional violations Plaintiff raises allegedly occurred from July 28, 2021, to November 21, 2022. (Pl. Amend. Compl., Doc. 63 at 4:11, 16-17:58.) During that time, Plaintiff's medical records show Dr. Tilden examined Plaintiff on January 21 and April 23, 2021, for complaints of left knee pain, but no medical documentation exists showing Dr. Tilden considered Plaintiff's complaints of right knee pain during that time. Thus, Defendant Hart initially asserts Dr. Tilden was not deliberately indifferent to Plaintiff's right knee complaints, as Plaintiff never raised that complaint to Dr. Tilden.

Plaintiff disputes Defendant Hart's assertion by appending his declaration to his response, claiming he had "medical encounters" with Dr. Tilden on February 25 and March 1 and 3, 2022, where he sought "treatment for his knee pain." (Pl. Res., Doc. 101 at 27:159, 65:37; Pl. Dep. Doc. 97-1 at 99:23-100:9.) Plaintiff's medical records, however, show the following: (1) an RN entry documenting Plaintiff's February 25, 2022, appointment

was rescheduled due to a "level 2 lockdown [and] short staff," (2) another RN note Plaintiff's March 1, 2022, appointment was rescheduled "due to lockdown," and (3) Hansen's examination of Plaintiff on March 3, 2022, for complaints of memory loss, fatigue, and bilateral knee pain. (Pl. Med. Rec., Doc. 97-3 at 19, 120-121.)

Under Federal Rule of Evidence ("Rule") 803(6), titled, Exceptions to the Rule Against Hearsay," provides as follows:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

*Murphy v. Caterpillar Inc.*, 140 F.4th 900, 908 (7th Cir. 2025) (quoting Fed. R. Civ. P. 803(6)). "Typically, 'to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the

documents were admissible business records.'" *Id*. (quoting *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000)).

In their respective declarations, Defendant Hansen and Dr. Arthur D. Funk, Wexford's Northern Illinois Regional Director, aver that medical records at Pontiac are kept in the course of regularly conducted business activity, as a regular practice, and made at or near the time HCU staff provides medical care to Pontiac inmates. (Funk Decl., Doc. 97-2 at 3:13, 15-16; Hansen Decl., Doc. 97-7 at 13-14.)

Medical records qualifying as business records under Federal Rule of Evidence 803(6) are presumed reliable "based on the lack of deceitful incentive and the habitual accuracy implicit within regularity." *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 956 (7th Cir. 2021); *see also Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) ("Such records are presumed reliable because businesses depend on them to conduct their own affairs, so there is little if any incentive to be deceitful, and because the regularity of creating such records leads to habits of accuracy.").

Additionally, under Federal Rule of Civil Procedure ("Rule") 803(7), evidence that a matter is not included in records of a regularly conducted activity as described by Rule 803(6), is admissible "to prove that the matter did not occur, " provided "the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness." *Id.*, *see also U.S. v. Keplinger*, 776 F.2d 678, 689–90 (7th Cir. 1985) ("Proof of absence of records that would ordinarily exist if a particular event had occurred is properly admitted to show that the event did not occur.").

Plaintiff characterizes the medical entries on February 25 and March 1, 2022, as "inaccurate," without elaboration. (Pl. Res., Doc. 101 at 18-19:106-109, 112.) However, Plaintiff's conclusory assertion, unsupported by specific facts, cannot create a genuine issue of material fact when, as here, Plaintiff's properly admitted medical record shows medical appointments did not occur on February 25 or March 1, 2022. *See Bordelon v. Bd. of Educ.*, 811 F.3d 984, 991 (7th Cir. 2016) (stating a plaintiff must offer "specific facts" rather than "sweeping generalizations" to preclude summary judgment); *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892–93 (7th Cir. 2003) ("Conclusory allegations alone cannot defeat a motion for summary judgment.").

Furthermore, Plaintiff acknowledges he saw Defendant Hansen on March 3, 2022, which is consistent with his medical records. (Pl. Res., Doc. 101 at 18-19:106-109, 112.) However, there is no indication Dr. Tilden was also present during Plaintiff's March 3, 2022, appointment with Hansen, despite Plaintiff's assertions to the contrary. (Pl. Dep., Doc. 97-1 at 78:23-79:1, 115:2-5, 122:3-7.)

As noted, Dr. Tilden saw Plaintiff on January 21 and April 23, 2021, for left knee pain, which is not an issue in this case. As for the events on August 6, 2021, the established facts show Plaintiff was escorted to the HCU and placed in a holding room until medical personnel were "ready to see you." (Pl. Dep., Doc. 97-1 at 32:1-4.) Plaintiff agreed that if an inmate were going to the HCU to receive healthcare, he would "always end up in that room first." (*Id.* at 33:12-15.)

However, the inference to be drawn from Plaintiff's brief encounters with Defendant Hansen and Dr. Tilden on August 6, 2021, is that Plaintiff sought to

circumvent the established procedures by having Hansen and Dr. Tilden provide him medical care as they passed by the holding room where Plaintiff was waiting. The fact Hansen and Dr. Tilden declined to provide Plaintiff care at that moment does not establish the mental state required to establish deliberate indifference in violation of the Eighth Amendment.

Defendants Hansen and Hart further note Plaintiff's medical records do not show he complained to them about right arm or right-hand pain or numbness during the alleged period. In response, Plaintiff states that in addition to the "medical encounters" he had with Dr. Tilden on August 6, 2021, he also cites his alleged encounters on February 25, 2022, and March 1 and 3, 2022. (Pl. Res., Doc. 101 at 10:31.) However, for the reasons already noted, Plaintiff fails to state a deliberate indifference claim against Dr. Tilden based on those dates.

Plaintiff also asserts he had encounters with Defendant Hansen on November 9, 2021, and March 3, 2022. However, Plaintiff's medical records show that in November 2021, Hansen considered Plaintiff's complaints of right knee pain. After documenting her medical observations, Hansen assessed Plaintiff as having right knee pain, prescribed Motrin, and referred Plaintiff for X-rays, which Plaintiff does not dispute is an appropriate diagnostic option given his right knee complaint.

On March 3, 2022, Defendant Hansen saw Plaintiff for memory loss, fatigue, and bilateral knee pain. Although Hansen documented Plaintiff's normal gait and absence of any observed knee deformities, she noted the X-rays showed Plaintiff had mild osteoarthritis in both knees. (*Id.* at 20.) Hansen ordered further testing for Plaintiff's

memory and fatigue complaints and prescribed fish oil pills as a treatment for Plaintiff's knee pain. Thus, Plaintiff's medical appointments with Defendant Hansen on November 9, 2021, and March 3, 2022, do not demonstrate that she considered complaints regarding Plaintiff's right arm or right-hand pain or numbness during the time alleged.

Regarding Plaintiff's allegation that Defendant Hansen and Dr. Tilden were deliberately indifferent to his COVID-related issues, Plaintiff asserts that on February 25 and March 1, 2022, he discussed treatment for his Long-COVID-19 symptoms with Dr. Tilden, with the supplement Prevagen[1] being mentioned, and Dr. Tilden noting Prevagen was too expensive. (Pl. Dep., Doc. 97-1 at 101:11–21.)

However, for reasons already noted, Plaintiff's medical records do not establish an appointment with Dr. Tilden on February 25 or March 1, 2022. Additionally, even if Dr. Tilden's treatment was based on financial considerations, the cost of care can be a permissible factor in choosing between acceptable treatments." *Jordan v. Milwaukee County*, 680 F. App'x 479, 483 (7th Cir. 2017); *see also Luckett v. Heidorn*, 566 F. App'x 516, 520 (7th Cir. 2014) (stating the defendant-doctor "could take into account the cost of alternative treatments so long as he did not choose a treatment that he knew would be ineffective"); *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 637 (7th Cir. 2024) ("'[A]dministrative convenience and cost may be, in appropriate circumstances, permissible factors for correctional systems to consider in making treatment decisions,'

---

[1] Prevagen is marketed as "an over-the-counter supplement for your brain" with the qualification that this claim has not been evaluated by the Food and Drug Administration and that "[t]his product is not intended to diagnose, treat or prevent any disease." Prevagen, https://prevagen.com/ (last visited -, 2026).

provided they do not consider these factors "to the exclusion of reasonable medical judgment about inmate health.'").

Plaintiff's medical record shows that in March 2022, Defendant Hansen ordered a series of tests to gauge Plaintiff's overall health, including blood composition and hormone levels, in response to Plaintiff's complaints of memory loss and fatigue. When Plaintiff returned to the HCU for a follow-up examination in April 2022, Hansen noted Plaintiff's normal test levels and provided recommended lifestyle changes to lower Plaintiff's elevated heart rate. In October 2022, Dr. Tilden opted to order a psychiatric evaluation for Plaintiff's memory loss complaints.

Even when Plaintiff was later diagnosed with osteoarthritis and Long-COVID after transferring to Pinckneyville, a Nurse Practitioner discontinued his fish oil prescription, ordered physical therapy to evaluate and treat Plaintiff's right knee pain, and prescribed acetaminophen 500mg twice daily as needed for six months. (Pl. Med. Rec., Doc. 97-3 at 2.) The Court notes that despite Plaintiff's unsupported allegation that Dr. Tilden opined Prevagen was too expensive as a treatment option, Plaintiff acknowledges Long-COVID treatment involves symptom management, as no cure exists and no medical protocol has been established as the standard of care. (Pl. Res., Doc. 101 at 6:116.)

Thus, the Court concludes that, given this record, no jury could conclude the actions taken by Defendant Hansen and Dr. Tilden to address Plaintiff's complaints of right shoulder and right knee pain, numbness in his right hand, and adverse COVID-19 symptoms establish deliberate indifference in violation of the Eighth Amendment or

demonstrate such a substantial departure from accepted medical professional judgment. *See Walker v. Peters*, 863 F. Supp 671, 673 (N.D. Ill. 1994) (granting summary judgment in the defendants' favor because the contemporaneously prepared medical records refuted the plaintiff's unsupported assertions of deliberate indifference to his serious medical needs).

### 2. Retaliation

It is well settled that a prison official who acts in retaliation for a prisoner's exercise of a constitutional right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-84, (1977). To make out a prima facie case of First Amendment retaliation, a plaintiff must establish that (1) he engaged in activity protected by the First Amendment, (2) he suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Plaintiff asserts Defendant Hansen and Dr. Tilden denied him medical treatment in response to dozens of sick call requests he submitted in August and September 2021, seeking medical attention for his right hand and shoulder pain.

Plaintiff testified he assumed Dr. Tilden had been made aware of his August and September 2021 sick call requests because he filed a grievance when they were ignored. (Pl. Dep. Doc. 97-1 at 61:19-62:6.) Plaintiff claims this admission is immaterial (Pl. Res., Doc. 101 at 39:148), but "speculation concerning retaliatory motives cannot create a genuine issue of material fact." *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013); *see*

*also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment.").

Plaintiff also claims Dr. Tilden told him he had received Plaintiff's February 2022 sick call requests when he met with Dr. Tilden on February 25, 2022. However, for the reasons already noted, Plaintiff's medical records do not establish such a meeting ever occurred. Even if Plaintiff met with Dr. Tilden on that date, "mere knowledge that someone has engaged in protected speech does not permit an inference that an adverse action occurred because of this knowledge." *Shaw v. Litscher*, 715 F. App'x 521, 523 (7th Cir. 2017); *see also Healy v. City of Chicago*, 450 F.3d 732, 741 (7th Cir. 2006) (concluding that "as a matter of law, mere knowledge of the plaintiff's protected activity prior to an adverse . . . action does not establish a retaliatory motive") (quoting *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999)); *see also Shaw v. Litscher*, 715 F. App'x 521, 523 (7th Cir. 2017) ("[M]ere knowledge that someone has engaged in protected speech does not permit an inference that an adverse action occurred because of this knowledge.").

Similarly, Plaintiff's testimony that during a November 9, 2021 appointment, Defendant Hansen admitted she had received his August and September 2021 sick call requests and was aware of an October grievance he had filed regarding them does not establish a retaliatory motive. (Pl. Dep., Doc. 97-1 at 62:7-64:13.) Plaintiff acknowledged Hansen did not state she would withhold providing medical care because Plaintiff named Hansen in his grievance. (*Id*. at 73:24-74:5.)

Furthermore, Plaintiff agreed that his only basis for asserting Defendant Hansen and Dr. Tilden allegedly ignored his February 2022 sick call requests is that he was not seen medically until after he filed an emergency grievance on February 14, 2022. However, "[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)).

Accordingly, because Defendants Hansen and Hart have satisfied their threshold burden of providing evidence to show the absence of a genuine issue of material fact Plaintiff has failed to rebut with specific facts, their Motion for Summary Judgment (Doc. 97) is granted.

**IT IS THEREFORE ORDERED:**

1. **The Motion for Summary Judgment (Doc. 97) filed by Defendants Cheryl B. Hansen and Pamela E. Hart, Administrator for the Estate of Dr. Andrew H. Tilden, is GRANTED.**

2. **If Plaintiff wishes to appeal this judgment, she must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* MUST identify the issues the plaintiff will present in his appeal to assist the Court in deciding whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be allowed to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good-faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff chooses to appeal, she will be liable for the $605.00 appellate filing fee, regardless of the outcome of the appeal.**

Entered May 8, 2026.

s/ *Colleen R. Lawless*

_____

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE
